UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

   Plaintiff,

 v.                     Case No. 21-CR-77

IAN ALAN OLSON,

   Defendant.

---

## UNITED STATES' SENTENCING MEMORANDUM

---

The United States of America, by its attorneys Richard G. Frohling, Acting United States Attorney, and Benjamin Proctor, Assistant United States Attorney, hereby submits a memorandum concerning sentencing in this matter.

### I. Introduction

Ian Olson faces sentencing after pleading guilty to one count of attacking U.S. servicemen on account of their service, in violation of 18 U.S.C. § 1389(a). He faces a maximum penalty of up to 2 years imprisonment, to be followed by up to 1 year of supervised release; or, alternatively, from 1 to 5 years of probation.

As part of the plea agreement in this case, the government will be dismissing the charge of resisting an officer, in violation of 18 U.S.C. § 111, which is a misdemeanor carrying a maximum penalty of up to one year in prison. The plea agreement permits both parties to recommend any lawful sentence to the Court.

As discussed below, Ian Olson engaged in very bizarre and troubling activity on March 15, 2021, near the U.S. Army reserve station in Pewaukee, Wisconsin. After his arrest, he made

1

statements indicating he might harm others. The government believes that protecting the public is the top priority in determining the appropriate sentence for Olson.

## II. Background

On the morning of March 15, 2021, Ian Olson was driving his sedan near the U.S. Army Reserve station in Pewaukee, Wisconsin. The sedan had been spray painted on all sides with words and symbols associated with the "QAnon" conspiracy theory. The words and symbols included: "Trust my plan," "OMW 2 DC," which is believed to mean, "on my way to Washington DC," "Great Awaken," and "WWG1WGA," which is often used by QAnon supporters meaning "where we go one, we go all."



When Olson arrived near the station, two U.S. Army servicemen dressed in Army uniforms were standing nearby in the parking lot of the reserve station. Olson got out of his vehicle, produced what appeared to be a rifle, pointed it directly at the servicemen, and exclaimed "This is for America!"

The rifle resembled an AR-15 and was painted orange.



It was, in reality, a paintball gun, though the servicemen did not know this at the time. Olson then shot two-to-three rounds of paintball projectiles at the reservists, who were about 15 yards away from him. After two or three shots, the gun jammed, and Olson stated, "You're lucky it jammed," or words to that effect. The servicemen, one of whom was an off-duty law enforcement officer, tackled Olson and held him until police arrived. None of the paintballs hit the servicemen, though one serviceman heard a paintball whiz by his head, and one of Olson's paintballs hit a canopy on the station grounds approximately 137 feet away from Olson's location.

Following Olson's arrest, police searched his vehicle. Inside, officers found a gas mask, throwing knives, police scanner, two-way radios, a taser, and ballistic military-style vest plates.

Olson was initially booked into the Waukesha County Jail on state charges associated with the attack on the servicemen. During that intake process, Olson commented that he had just returned from Washington, D.C., where he failed in sending his "message." A short time later, Olson said something along the lines of: "I'm going to cause mass casualties when I get out of jail," "I am ready for this. How many people need to die for a message to get across," and "I almost have everything ready." Olson then muttered under his breath, "People will remember my name."

A jail officer who overheard these comments notified law enforcement. A sheriff's deputy visited the jail to check on Olson. The deputy asked Olson if he wanted to hurt himself or others, or if Olson planned to do so. Olson replied "no" to all questions. Olson refused to speak with a mental-health worker, who also visited the jail to talk with Olson.

Records show that Olson was in Washington, D.C., in early March 2021. On March 3rd, Olson approached a National Guardsman, stating he was "maybe going to do something crazy stupid tomorrow" and asked them not to shoot him. Shortly thereafter, U.S. Capitol Police stopped Olson, who said he wanted to "test the National Guard tomorrow to see if they were loyal to the people or to the President." Olson said that if he was shot by the National Guard, he would know the National Guard to be loyal to the President; if Olson was not shot, he would know the National Guard to be loyal to the people. Olson did not provide further details about his plan except to say that he was waiting to be led by God, his actions would "be big," and he was "willing to die to fulfill this mission." Referencing March 4, 2021, Olson said he would be "taken over by the Spirit of Christ and lead the people to unity" and "things can only be resolved by the barrel end of a gun." The U.S. Capitol Police determined Olson was a danger to himself and others, and they transported Olson for a psychiatric evaluation.[1]

Olson was charged by federal criminal complaint on March 19, 2021. Following his initial appearance that same day, Olson was ordered detained pending trial in this matter. The indictment was issued on April 13, 2021.

### III. Guideline Calculation and Recommendation.

With regard to the applicable guidelines, the parties agree that the base offense level is 7 under U.S.S.G. § 2A2.3(a)(1), and that a 6-level increase for attacking government officers based

---

[1] Further information about this evaluation and treatment is included in the presentence report.

on their status as government officers is applicable under U.S.S.G. § 3A1.2. Olson also receives a 2-level decrease for timely acceptance of responsibility under U.S.S.G. § 3E1.1(a). With this in mind, the parties anticipate a total offense level of 11. The presentence report (PSR) indicates that Olson falls into criminal history category I, which would result in a Zone B advisory guidelines range of 8 to 14 months imprisonment, or alternatively, 1 to 5 years on probation.

**IV.     The Government's Sentencing Recommendation.**

Overall, the court must impose a sentence that is sufficient, but not greater than necessary. To this end, the court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, to afford adequate deterrence, and protect the public from further crimes by the defendant; and to provide the defendant with needed training opportunities or medical care. The court must also consider the kinds of sentences available, the Sentencing Guidelines range, policy statements of the Sentencing Commission, the need to avoid unwarranted disparities, and the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

   A.  The Nature and Circumstances of the Offense.

Olson's words and actions show that he has extreme beliefs and violent tendencies that are apparently informed by online conspiracy theories. He has threatened violence against military members; asserted he would cause "mass casualties"; and he traveled great distances—from Wisconsin to Washington, D.C. and back—in furtherance of his "mission." His conduct was incredibly disturbing and indicated that, prior to his arrest and detention, he was on a path to harm people, including himself.

5

B. The History and Characteristics of the Defendant.

The information collected as part of the PSR process indicates that Olson's conduct in February and March 2021 reflected a recent shift in his priorities and mental health. This was the conclusion of his wife and mother and was reinforced by the diagnosis of Medstar Washington Hospital Center following Olson's psychiatric evaluation in early March 2021. Based on the evidence, including the spray paint on Olson's car, his handwritten notes, and reports from the U.S. Capitol Police, it seems Olson's conduct stemmed at least in part from his copious consumption of online conspiracy material.

Olson has no known criminal convictions, though he has a history of drug abuse. He also has no real history of gainful employment and instead receives assistance through other means, as discussed in the PSR. To his credit, Olson timely accepted responsibility in this matter by entering a guilty plea.

C. The Need to Protect the Public, Promote Just Punishment, Promote Respect for the Law, Provide for Deterrence, and Provide Medical Care for the Defendant.

Given Olson's bizarre comments about causing mass casualties, the government believes that protecting the public is the top priority in fashioning an appropriate sentence for Olson. The key question is how best to meet this goal while also promoting the other goals of sentencing. As noted, one of the other goals of sentencing is to provide appropriate medical care for the defendant. 18 U.S.C. § 3553(a)(2)(D). As discussed in the presentence report, Olson received a diagnosis in March 2021 while in Washington, D.C. But given his detention (which stemmed from his own comments and conduct), he has not received further diagnosis or treatment. Olson's conduct giving rise to this prosecution indicates that mental health monitoring and treatment would benefit Olson and help protect the public.

One option to best protect the public is to keep Olson in custody. In this case, the guidelines call for a sentence of 8 to 14 months in prison. Olson would receive credit for the 8 months he has already spent in pretrial custody, meaning that if he was sentenced to a prison term within the anticipated guidelines range, he would be released very soon. Given Olson's comments, which are not accounted for specifically in the guidelines' calculation, a sentence at or above the high-end of the guidelines would be justified. At most, the court could impose a total prison term of 24 months.

Alternatively, the Court could impose up to 5 years of probation with a variety of conditions. Such conditions might include home confinement, location monitoring, mental health treatment, and computer monitoring.

Ultimately, there are no easy answers in a case like this. Again, the government's top priority is protecting the public. Given that a 5-year probation sentence would last well beyond any prison term that might be imposed in this case, such a sentence might be an appropriate way to address the factors under 18 U.S.C. § 3553(a).

If the Court imposes a term of probation, the government recommends that the Court impose all of the supervision conditions listed on pages 19 through 24 of the PSR, along with some form of the following additions:

- <u>Home confinement with GPS location monitoring</u>: The defendant must remain at his residence except for travel to and from any employment, for medical and mental health treatment, and for any other reason as may be approved in advance by the U.S. Probation Office. The defendant shall pay any costs associated with location monitoring and may request relief from this condition after the first 12 months of probation are completed.

- <u>Computer monitoring</u>[2]: The defendant must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) he

---

[2] This condition is proposed because the defendant's violent conduct appears directly related to his online activity. Rather than attempt to prohibit the defendant from visiting a list of websites, the goal of this proposed condition is to protect the public by allowing the U.S. Probation Office to assess to scope of Olson's online activity and limit exposure to triggers of negative behavior.

uses. To ensure compliance with the computer monitoring condition, the defendant must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted to determine whether the monitoring software is functioning effectively after its installation, and whether there have been attempts to circumvent the monitoring software after its installation. An officer may conduct an investigative search of the computer only when reasonable suspicion exists that the offender has violated a condition of their release and the computer may contain evidence of this violation. The defendant must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition. The defendant shall pay all costs of participation in the computer monitoring program.

## V. Conclusion

Olson's conduct goes beyond shooting paintballs at soldiers. The shooting was one act in a saga that spanned from Wisconsin to Washington D.C. and back, all in furtherance of his vague and misguided "mission." His post-arrest comments about causing a "mass casualty event" are incredibly disturbing and justify a sentence that prioritizes protecting the public. Counsel for the United States intends to make additional comments at the sentencing hearing.

Dated in Milwaukee, Wisconsin, this 16th day of November, 2021.

          RICHARD G. FROHLING
          Acting United States Attorney

By:   /s
      BENJAMIN PROCTOR
      Assistant United States Attorney
      Benjamin Proctor Bar No.: 1051904
      Office of the United States Attorney
      Eastern District of Wisconsin
      517 E. Wisconsin Ave. Suite 530
      Milwaukee, Wisconsin 53202
      Tel: (414) 297-1700
      Email: benjamin.proctor@usdoj.gov